IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





AP-75,167





JUAN RAUL NAVARRO RAMIREZ, Appellant



v.
 


THE STATE OF TEXAS





ON DIRECT APPEAL


FROM CAUSE NO. CR-0551-04-G IN THE 370TH DISTRICT COURT (1)

HIDALGO COUNTY





 Cochran, J., delivered the opinion of the Court, in which Keller, P.J.,
Price, Johnson, Keasler, Hervey and Holcomb, JJ., joined. Meyers and
Womack, JJ., not participating.


O P I N I O N


 

 Appellant was convicted in December 2004, of two counts of capital murder. Tex.
Penal Code §§ 19.03(a)(2) and 19.03(a)(7). Based on the jury's answers to the special issues
set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial
judge sentenced appellant to death for each count. Art. 37.071, § 2(g). (2) Direct appeal to this
Court is automatic. Art. 37.071, § 2(h). After reviewing appellant's twenty-seven points of
error, we affirm the trial court's judgment and sentence of death for Count One, and we reverse
appellant's capital-murder conviction in Count Two on the grounds of double jeopardy and
vacate the judgment on that count.

STATEMENT OF FACTS

 This trial involved the gang-related, "pseudo-cop" robbery-homicide of six men, some
of whom were rival gang members of the "Bombita" gang to which appellant belonged.

 In the early morning hours of January 5, 2003, police responded to a 9-1-1 call and
found the bodies of six men at 2915 East Monte Cristo Road in Edinburg. There were two
houses on the property that were separated by a dirt driveway. Police found the body of Jerry
Hidalgo in the kitchen of the larger house that was located on the west side of the driveway (the
"west-side house"). (3) He was lying face down on the floor and his hands and legs were bound
with extension cords. He had sustained numerous gunshot wounds, and there was a bullet hole
in his back and blood around his head. The living room had been ransacked, and it appeared that
someone had rummaged through one of the bedrooms, leaving the bed mattress standing on its
side.

 The body of Juan Delgado, III, was lying face down in the grass outside the front door
of the smaller house on the east side of the driveway (the "east-side house"). He had suffered
a fatal gunshot wound to the back of his neck. There was a live 9-millimeter round in the grass
near his body. As they entered the house, police discovered the bodies of Juan Delgado, Jr.,
who had been shot in the back and head, and Jimmy Almendarez, who had suffered multiple
gunshot wounds, including a fatal head wound. Police also found a magazine clip underneath
a stereo speaker. The bodies of Ray Hidalgo and Ruben Castillo were in another room. Ray
had sustained two gunshot wounds to the head and was missing an eye. Ruben had suffered
multiple gunshot wounds including shots to the buttocks. Police also found a burnt marijuana
cigarette and small baggies of marijuana and cocaine in that room. The "east-side house" had
also been ransacked, and the victims' pockets had been pulled out.

 Some of the ballistics evidence recovered from the scene included 7.62 by 39 caliber
bullets and casings. (4) Police also recovered a cooking pan and some black skull caps from the
west-side house and a "cold weather knit cap" from the open field behind the houses. There
were three cars parked at the scene: an inoperable dark-colored Dodge Ram that belonged to
Rosie Gutierrez; a small maroon car that had been rented by Jimmy Almendarez; and a brown
Buick Regal that belonged to Luis Villa. 

 Rosie Gutierrez was present during the shootings and called 9-1-1 after the assailants
left the scene. She testified that she and her sons, Jerry and Ray Hidalgo, lived at 2915 East
Monte Cristo Road, and that the Delgados, Almendarez, and Castillo were her sons' friends. 
On the night of January 4, she played dominoes with her sons in the west-side house. Ray went
to the east-side house with Delgado, Jr., at around midnight. Shortly thereafter, she and Jerry
finished playing dominoes and went into the living room. Ms. Gutierrez suffered from a
medical condition that affected her legs, so she laid down in a borrowed hospital bed she kept
in the living room to watch television while Jerry talked on the phone with a friend. She heard
loud booming noises that sounded like fireworks; then someone banged on her door, and three
or four men entered her house. The leader, a man who spoke Spanish and who had a long gun
with holes in the barrel, pointed the gun at her head and told her to lie down and face the wall. 
He was wearing a ski mask and a jacket with the word "Police" on the sleeves and back. He
ordered his cohorts to tie up Ms. Gutierrez and Jerry, and they used extension cords to do so. 
The man who tied up Ms. Gutierrez was unmasked and carried a smaller handgun. The other
men who restrained Jerry were masked, and she was unsure if they had guns. The leader
demanded "drugs, money, gold and guns" and kept hitting Jerry in the head with his gun. Jerry
responded that they did not have anything. "They" told Jerry to take off his gold necklace and
asked for the car keys. Jerry answered that the car was "no good" and that they would get
caught if they left in it. "The guy" pulled off Jerry's tennis shoes and asked if anyone wanted
them. He then dropped the tennis shoes, stating, "Let's go," and they left. 

 Shortly thereafter, "a man with a ski mask" carrying a long gun and wearing a jacket with
"Police" on it came back into the house and ransacked the living room. He left, came back
inside, shot Jerry "a whole bunch of times," then left again. Ms. Gutierrez then untied herself
and called 9-1-1. 

 Police later questioned Luis Villa, who was also present at the scene on the night of the
shootings. Villa told police that he and Castillo took Delgado, Jr. to "Ray's house" at 9:30 p.m. 
Villa and Castillo then tried to go to a nightclub. Villa was denied entrance to the club because
he did not have proper identification, so they returned to Ray's house at about 10:30 p.m. 
Delgado, III, came to the house with a friend about 12:30 a.m. Castillo went outside to use the
bathroom, and Villa heard a voice tell Castillo: "Hey you mother fucker get your ass on the
floor . . ." Delgado, Jr., said there were a lot of people with guns outside. Villa, who was
seated on a sofa, heard some gunshots and jumped out the window. He told Delgado, Jr., to
follow him, but he did not do so. As Villa ran away, he heard "two kinds of machine guns
shooting at the same time."

 Villa's friend Jose Carreon testified that he called Villa on his cell phone around 1:00
or 1:30 a.m. Villa, who was "scared, tired, [and] running," said that "they were shooting at him,
and they shot his cousins." (5) Carreon heard gunshots in the background. Carreon also lived near
the scene and heard gunshots outside. 

 Police received information about a "pseudo-cop" robbery and took various suspects
into custody. Police also discovered that suspect Rodolfo Medrano (a/k/a "Kreeper") had
given his friend Miguel Tinajero some weapons to hide. Tinajero testified that on January 20,
Medrano gave him a long case and said, "Take this and put it away." Tinajero later opened the
case and saw three military-style rifles inside. Tinajero placed the weapons inside the trunk
of a car at his father's residence in Elsa. When he opened the trunk, he saw that other weapons
had already been placed inside. He testified that Medrano had been to his father's residence
before and knew where the car keys were kept. Tinajero notified police about the guns. Two
of the guns, State's Exhibits 107 and 113, had apparent bloodstains and were submitted for
DNA testing. The stain on the stock area of State's Exhibit 107 was inconclusive. The stain
on the muzzle of State's Exhibit 113 was consistent with the DNA profile of victim Delgado,
Jr. 

 Appellant was eventually arrested and gave an audiotaped statement to police. In his
statement, he admitted that he "used to hang around with" some "TCB" (6) gang members. He said
that at 7:00 or 8:00 p.m. on January 4, Robert Garza (a/k/a "Bones") called and asked him if
he wanted to make some money. "Bones" told him it was about "some jelly beans," which
means "some pounds." Bones told him an amount, which appellant thought was "a thousand
pounds or a little bit more of something." He agreed to participate and met Bones at the home
of a person who went by the name Juanon (a/k/a "Barney"). Some of the other people present
included Salvador Solis, Freddy Krueger, and Marcial Bocanegra. Most of them were wearing
black, some wore ski masks, and all of them wore gloves. Appellant stated that "it was
supposed to be a pseudo-cop" type of robbery, and they "were supposed to go in there to look
for drugs and weapons." 

 Appellant stated that when he arrived at Juanon's, the guns and bullets had already been
cleaned of fingerprints. Appellant, the last one to choose his weapon, selected a "cuerno de
chivo." (7) Appellant said the men drove to the scene in a black or dark blue truck and a light
brown Escalade, and the "one with the Escalade" was "the one who was telling us what was
going down." The "one with the Escalade" said: "They got guns and there might be some
people in there, too, so you gotta put them down 'cause the family members got some guns."

 Appellant stated that they hid in the tall grass in a field behind the houses with their
high-caliber weapons. When a man stepped outside to use the bathroom, they got up, "started
rushing the houses," and "rushed him in." Appellant, Salvador, and another man went into one
house where "there was only a lady and a guy." (8) Appellant stated: "We heard . . . some
gunshots in the other house, but we didn't know what was it about, so we didn't think nothing
bad was happening." Appellant stated that they put the male victim down on the floor at
gunpoint and that he ordered one of the men to tie up the female victim, who was in bed. 
Appellant checked the house for other people, drugs, or weapons but did not find anyone or
anything. Appellant then "tied down the guy with an orange extension cord" and "started
demanding the drugs." The male victim responded that he had nothing and that all of the drugs
were in the other house, so appellant "started beating him up" and "hit him with a pan a couple
of times." Appellant also took a gold chain from his neck, which he later threw away. 

 Appellant said that Salvador kept an eye on the door and that appellant and "the other
guy" held the male victim at gunpoint. After a while, appellant heard gunshots at the other
house. He went outside and saw the others running out of the house, saying, "Let's go. Let's
go." He asked one of them "where was everything at" and was told "that nothing was there, and
that we gotta leave." Appellant heard more gunshots as he and his two cohorts were running
away. They ran across the field, got into the truck, and left. Everyone met back at Juanon's,
where appellant heard Bones say, "I shot the mother fuckers." (9)

 Investigator David Valdez testified that four high-caliber bullet projectiles, State's
Exhibits 229, 230, 231, and 232, were recovered from Jerry Hidalgo's body during his
autopsy. Forensic firearms and toolmarks examiner Tim Counce testified that these exhibits
"were .30 caliber class" and offered "a more discriminating opinion to include a 7.62 by 39
millimeter cartridge." 

 When appellant was booked into the county jail, he told detention officer Robert
Mendiola that he was affiliated with the "Bombita" gang. Investigator Robert Alvarez with the
Edinburg Police Department testified that the "Tri-City Bombers" gang used to call themselves
"the TCBs," but now call themselves "the Bombitas." Alvarez testified that some TCB
members formed a rival gang, the Texas Chicano Brotherhood, or "the Chicanos." Alvarez
further testified that the "Bombitas" and "Chicanos" have "a green light against each other,"
meaning they could fight or kill each other "without asking permission from the [gang]
command structure." Alvarez testified that appellant associated with TCB members and had
a tattoo that was indicative of TCB membership. Rosie Gutierrez testified that victims Jerry
and Ray Hidalgo were "Chicanos."

 Defense witness Marissa Martinez testified that she and a friend visited the east-side
house a few days before the murders. Villa, Castillo, Delgado, Jr., and Ray Hidalgo were there. 
She testified that Villa showed her that they were "stashing drugs" in a room at the east-side
house. The drugs were "stacked to the ceiling" and "covered with a blue tarp." She testified
that there were "a lot" of drugs, estimating the amount at "[l]ike 1,000" pounds. She told her
boyfriend Robert Cantu that there was a lot of marijuana at Ray Hidalgo's house and that she
had met Villa there. She testified that Cantu was angry at her for going over to the house. She
further testified that Villa was a member of the "Texas Syndicate" gang.

 Defense witness Jennifer Marie Dimas testified that she was the common-law spouse
of victim Delgado, III. She testified that Villa had bought bulletproof vests about two to three
months before the murders and that he tried to get one from Delgado, III, on January 4.

 Defense witness Gloria Ann Rivera testified that she was the former girlfriend of victim
Ray Hidalgo. She testified that Ray had been living with his mother, Rosie Gutierrez, and that
it "was kind of getting to a point that [Ms. Gutierrez] didn't really want him there because . . .
he wouldn't work." Several hours after the shootings, Rivera heard Ms. Gutierrez talking on
the phone to Villa and saying "[s]omething in regards to sticking to the story." Ms. Gutierrez
admitted that she had been having a relationship with Villa. She testified that she called Villa
after the murders and asked him what happened, but the phone "cut off." 

DOUBLE JEOPARDY

 In his fourth and fifth points of error, appellant contends that the trial court 

violated the federal and state constitutional protections against double jeopardy by subjecting
him to multiple punishments for the same offense. U. S. CONST. amend. V; TEX. CONST. art.
I, § 14. Count One of the indictment alleges that appellant:

. . . did then and there intentionally and knowingly cause the deaths of Jimmy
Almendarez, Juan Delgado, III, Jerry Eugene Hidalgo, Juan Delgado, Jr., Ruben
Castillo, and Ray Hidalgo, by shooting them with a firearm, and said murders
were committed during the same criminal transaction[.]


Count Two of the indictment alleges that appellant:

. . . did then and there intentionally and knowingly cause the deaths of Jimmy
Almendarez, Juan Delgado, III, Jerry Eugene Hidalgo, Juan Delgado, Jr., Ruben
Castillo, and Ray Hidalgo, by shooting them with a firearm, and the defendant
was then and there in the course of committing or attempting to commit the
offense of robbery of Jimmy Almendarez, Juan Delgado, III, Jerry Eugene
Hidalgo, Juan Delgado, Jr., Ruben Castillo, and Ray Hidalgo, and the defendant
did then and there commit said capital murder as a member of a criminal street
gang[.]


There were two jury charges, one for each count of capital murder. The jury convicted
appellant of both counts of capital murder, and the trial court sentenced appellant to death for
each count.

 The State concedes that appellant may raise this claim for the first time on appeal
because the double-jeopardy violation is clearly apparent on the face of the record and
enforcement of the usual rules of procedural default serves no legitimate state interest. See
Gonzalez v. State, 8 S.W.3d 640, 642-643 (Tex. Crim. App. 2000). The State also concedes
"that imposing two death sentences under the facts in this case constitutes a multiple
punishment jeopardy violation."

 Section 19.03 of the Texas Penal Code lists several different ways to commit the
offense of capital murder. Appellant was convicted and sentenced to death in two separate
counts for murder in the course of robbery under Section 19.03(a)(2) and for murdering more
than one person during the same criminal transaction under Section 19.03(a)(7). (10) Both
counts, however, arise from the same conduct on the same date involving the same victims. 
The same evidence that formed the basis for "the same criminal transaction" element in Count
One also formed the basis for the robbery element in Count Two. There is only one "allowable
unit of prosecution" under the statute in this circumstance. See Sanabria v. United States,
437 U.S. 54 (1978). Thus, we agree that appellant was subjected to multiple punishments for
the same offense in violation of the federal and state constitutional protections against double
jeopardy. Points of error four and five are sustained. 

 When a defendant is convicted of two offenses that are the "same" for double jeopardy
purposes, the "most serious" offense is retained and the other conviction is set aside. Ex parte
Cavazos, 203 S.W.3d 333, 337 (Tex. Crim. App. 2006). The "most serious" offense is
generally the offense of conviction for which the greatest sentence was assessed. Id. at 338. 
However, in this case, the same sentence was assessed for each capital murder conviction. 
Similarly, in Saenz v. State, 166 S.W.3d 270 (Tex. Crim. App. 2005), the defendant was
convicted of three counts of capital murder under Section 19.03(a)(7) and received three life
sentences. Two of the three convictions were based on party liability. Id. at 271. The court
of appeals determined that double jeopardy was violated, acquitted the defendant of the two
capital murders based on party liability, and upheld the defendant's conviction for capital
murder as a principal. Id. We affirmed the judgment of the court of appeals. Id. at 274. In
this case, however, the jury was authorized to convict appellant as a party or a principal for both
counts. The State suggests that we vacate the trial court's judgment and sentence of death for
Count Two, and appellant has not expressed a preference in his brief. Thus, we reverse
appellant's capital murder conviction and vacate the judgment in Count Two.

MOTION TO QUASH THE INDICTMENT

 In point of error seven, appellant complains: "The trial court erred in overruling
Defendant's motion to quash the indictment, complaining that the second count of the
indictment charged two offenses in the same count, engaging in organized criminal activity and
capital murder." He cites one case, Villalva v. State, 151 S.W.2d 222 (Tex. Crim. App. 1941),
in support of his claim. Because we reverse and vacate the judgment in Count Two, this claim
is moot. Point of error seven is overruled. 

SUFFICIENCY OF THE EVIDENCE

 Appellant claims in points of error one, two, and three that "[t]he verdict is contrary to
the law and evidence" and that the evidence is legally and factually insufficient to support his
capital murder conviction. He contends that he did not kill anyone and that he had no intent to
promote or assist the commission of capital murder by another. 

 In evaluating the legal sufficiency of the evidence, we must view the evidence in the
light most favorable to the verdict and determine whether any rational trier of fact could have
found the essential elements of the offense beyond a reasonable doubt. See Jackson v.
Virginia, 443 U.S. 307, 319 (1979). Evidence is factually insufficient when, although legally
sufficient under a Jackson v. Virginia analysis, the evidence is so weak that the jury's verdict
seems clearly wrong and manifestly unjust, or when, considering conflicting evidence, the
jury's verdict, though legally sufficient, is nevertheless against the great weight and
preponderance of the evidence. Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App.
2006).

 Having vacated the judgment in Count Two, we need only determine if the evidence was
sufficient to support his capital murder conviction in Count One. The charge of the court in
Count One authorized the jury to convict appellant as either a principal or as a party under
Section 7.02(a) of the Texas Penal Code. (11) The charge stated in pertinent part:

 Now, if you believe from the evidence beyond a reasonable doubt 

that on or about JANUARY 5, 2003 in Hidalgo County, Texas, the Defendant,
JUAN RAUL NAVARRO RAMIREZ, did then and there intentionally or
knowingly cause the deaths of Jimmy Almendarez, Juan Delgado, III, Jerry
Eugene Hidalgo, Juan Delgado, Jr., Ruben Castillo, and Ray Hidalgo, by shooting
them with a firearm and said murders were committed during the same criminal
transaction;


OR


 If you believe from the evidence beyond a reasonable doubt that on or
about JANUARY 5, 2003 in Hidalgo County, Texas, ROBERT GARZA a/ka/
[sic] BONES, JUANON a/k/a BARNEY, FREDDY KRUEGER, SALVADOR
SOLIS, MARCIAL BOCANEGRA, or RODOLFO MEDRANO a/k/a KREEPER,
did then and there intentionally or knowingly cause the deaths of Jimmy
Almendarez, Juan Delgado, III, Jerry Eugene Hidalgo, Juan Delgado, Jr., Ruben
Castillo, and Ray Hidalgo, by shooting them with a firearm and said murders
were committed during the same criminal transaction, and the Defendant, JUAN
RAUL NAVARRO RAMIREZ, then and there knew of the intent, if any, of the
said ROBERT GARZA a/ka/ [sic] BONES, JUANON a/k/a BARNEY, FREDDY
KRUEGER, SALVADOR SOLIS, MARCIAL BOCANEGRA, or RODOLFO
MEDRANO a/k/a KREEPER, to murder the said Jimmy Almendarez, Juan
Delgado, III, Jerry Eugene Hidalgo, Juan Delgado, Jr., Ruben Castillo, and Ray
Hidalgo, by shooting them with a firearm, and the Defendant acted with intent
to promote or assist the commission of the offense by ROBERT GARZA a/ka/
[sic] BONES, JUANON a/k/a BARNEY, FREDDY KRUEGER, SALVADOR
SOLIS, MARCIAL BOCANEGRA, or RODOLFO MEDRANO a/k/a KREEPER,
by encouraging, directing, aiding or attempting to aid ROBERT GARZA a/ka/
[sic] BONES, JUANON a/k/a BARNEY, FREDDY KRUEGER, SALVADOR
SOLIS, MARCIAL BOCANEGRA, or RODOLFO MEDRANO a/k/a KREEPER,
to commit the offense of capital murder of Jimmy Almendarez, Juan Delgado,
III, Jerry Eugene Hidalgo, Juan Delgado, Jr., Ruben Castillo, and Ray Hidalgo,
by carrying a firearm to the scene of the crime, by rushing Ruben Castillo, a
victim, into the eastside house at the scene of the crime, by tying up Jerry
Eugene Hidalgo, a victim, by directing Marcial Bocanegra to tie up Rosie
Gutierrez, by asking where the drugs and money were at the scene of the crime,
by searching the house at the scene of the crime, by telling other gang members
when to leave the scene, or by beating Jerry Eugene Hidalgo, a victim, with a
pan, then you will find the Defendant, JUAN RAUL NAVARRO RAMIREZ,
guilty of the offense of Capital Murder as alleged in the indictment.


The jury returned a general verdict of guilty as charged in the indictment.

 The evidence showed that victims Almendarez, Delgado, III, Jerry Hidalgo, Delgado, Jr.,
Castillo, and Ray Hidalgo were all shot to death during a "pseudo-cop" type of robbery. In his
own statement to police, appellant implicated himself, Bones, Juanon, Krueger, Solis, and
Bocanegra. He did not mention Rodolfo Medrano a/k/a "Kreeper"; however, he stated that he
did not know the names of some of the other individuals who were involved. The evidence
showed that Medrano later hid weapons that were used in the offense. Appellant stated that "it
was supposed to be a pseudo-cop robbery" and "we were supposed to go in there to look for
drugs and weapons, and that was it." However, he was aware that the guns and bullets had been
cleaned of fingerprints and was told prior to the offense that the victims had guns, "So you
gotta put them down." Appellant, along with the other assailants, selected a weapon, brought
it to the scene, hid in the tall grass behind the houses, and "rushed" a man who went outside to
use the bathroom. Appellant admitted that he and two others rushed into one house where
"there was only a lady and a guy" and that he tied up the male victim and ordered another to tie
up the female victim. He also admitted that he searched the house, demanded the drugs, and
beat the male victim with a pan. Surviving witness Rosie Gutierrez confirmed that the assailant
who was giving orders to the others also demanded "drugs, money, gold and guns" while beating
Jerry Hidalgo. 

 The evidence, when viewed in the light most favorable to the verdict, was such that any
rational trier of fact could have found the essential elements of the offense beyond a
reasonable doubt. Jackson, 443 U.S. at 319. Further, the evidence was not so weak that the
jury's verdict seems clearly wrong and manifestly unjust, nor was the jury's verdict against the
great weight and preponderance of the evidence. Watson, 204 S.W.3d at 414-15. Points of
error one, two, and three are overruled.

 In points of error 2a and 3a, appellant contends that the evidence is legally and factually
insufficient to support the sentence of death. He challenges the sufficiency of the evidence
to support the jury's affirmative answers to the anti-parties and future dangerousness special
issues in the punishment-stage jury charge. (12) The anti-parties issue is amenable to both a
factual and a legal sufficiency review, but the future-dangerousness issue is amenable only to
a legal sufficiency review. Valle v. State, 109 S.W.3d 500, 504 (Tex. Crim. App. 2003);
Renteria v. State, 206 S.W.3d 689, 707 (Tex. Crim. App. 2006).

 The anti-parties special issue in the charge asked:

Do you find from the evidence beyond a reasonable doubt that JUAN RAUL
NAVARRO RAMIREZ, the Defendant himself, actually caused the deaths of
Jimmy Almendarez, Juan Delgado, III, Jerry Eugene Hidalgo, Juan Delgado, Jr.,
Ruben Castillo, and Ray Hidalgo, the deceased, on the occasion in question, or,
if he did not actually cause the death of the deceased, that he intended to kill the
deceased or another or anticipated that a human life would be taken?


The jury answered in the affirmative. Appellant argues that the evidence is insufficient to show
that he actually caused the deaths of the deceased, that he intended to kill the deceased or
another, or that he anticipated that a human life would be taken. He also contends that the
evidence fails to show that he is a "defendant whose participation is major and whose mental
state is one of reckless indifference to the value of human life," as required by Tison v.
Arizona, 481 U.S. 137, 152 (1987).

 In support of his argument, appellant contends that others planned the offense and
provided the weapons and that he "was recruited rather than being a leader." He asserts that
there is no evidence that he "expected violence to erupt during the incident." He claims that
there is no evidence that he "should have known that the masked man would return to shoot
Jerry [Hidalgo]" or that he was physically present when that shooting occurred. He further
contends that his acts of tying up Jerry Hidalgo and hitting him with a pan did not equal
"reckless indifference to the value of human life."

 The evidence showed that appellant did much more than tie up Jerry Hidalgo and hit him
with a pan. He went armed to the scene and assumed a leadership role when he entered the
west-side house. By his own admission, he ordered one of his cohorts to tie up Ms. Gutierrez,
he searched the house, and he held Jerry at gunpoint, demanding the drugs from him and beating
him when he failed to "cooperate." He also admitted that he took a gold chain from Jerry. Ms.
Gutierrez confirmed in her testimony that the masked man with the "Police" jacket who
ordered the assailants to tie up her and Jerry also demanded "drugs, money, gold and guns," hit
Jerry in the head multiple times, and at one point stated, "Let's go."

 The evidence also showed that appellant anticipated that a human life would be taken. 
He knew that the guns and bullets had been cleaned of fingerprints and he had been told: "They
got guns and there might be some people in there, too, so you gotta put them down 'cause the
family members got some guns." The evidence showed that the targets of the robbery were
drug dealers from an opposing gang, and Investigator Alvarez testified that the gangs had "a
green light" to fight with or kill each other.

 Finally, there was circumstantial evidence that tended to show that appellant himself
may have shot and killed Jerry Hidalgo. Ms. Gutierrez testified that the assailant in charge of
the west-side house was wearing a ski mask and a "Police" jacket. The evidence points to
appellant as that assailant. Ms. Gutierrez could not identify Jerry's shooter, but she testified
that he was also wearing a ski mask and a "Police" jacket. Appellant admitted that he had a
"cuerno de chivo," which Officer Ruiz testified was an AK-47, which uses 7.62 by 39 caliber
bullets. Bullets recovered from the scene and from Jerry's body during the autopsy were
identified as 7.62 by 39 caliber.

 The evidence, viewed in the light most favorable to the verdict, is sufficient to show that
appellant intended to kill the deceased or another or anticipated that a human life would be
taken. Jackson, 443 U.S. at 319. The jury's affirmative answer to the anti-parties special issue
is not clearly wrong and manifestly unjust or against the great weight and preponderance of the
evidence. Watson, 204 S.W.3d at 414-15. The evidence was legally and factually sufficient
to support the jury's affirmative answer to the anti-parties special issue. The evidence was also
sufficient to satisfy the Tison requirements of major participation plus reckless indifference. 
481 U.S. at 152.

 With regard to the future dangerousness special issue, the State presented punishment
evidence that appellant, who was eighteen years old when he committed the instant offense, had
numerous prior juvenile adjudications. In 1998, appellant was adjudicated for burglary of a
vehicle, two counts of criminal trespass, and possession of marijuana, and he was placed in a
juvenile rehabilitation facility. In 2000, he was confined in a Texas Youth Commission facility
after pleading true to: two counts of aggravated assault, one for intentionally and knowingly
causing bodily injury with a knife and one for intentionally and knowingly causing bodily injury
with a firearm; and two counts of aggravated assault, one for knowingly discharging a firearm
at a vehicle and one for knowingly discharging a firearm at a habitation. The State also
presented punishment evidence that appellant, while in the Hidalgo County Jail awaiting trial,
hid marijuana and razor blades in his cell. The evidence, viewed in the light most favorable to
the verdict, is sufficient to show that there is a probability that appellant would commit
criminal acts of violence that would constitute a continuing threat to society. Jackson, 443
U.S. at 319. Points of error 2a and 3a are overruled.

CONSTITUTIONALITY OF SECTION 71.02

 In point of error eleven, appellant argues that Section 71.02 of the Texas Penal Code
is unconstitutional because it "makes the defendant responsible for the acts of others without
requiring proof beyond a reasonable doubt." However, the record reflects that appellant was
neither charged with nor convicted of Engaging in Organized Criminal Activity under Section
71.02. He was charged with and convicted of Capital Murder under Section 19.03. 

 Appellant cites In re Winship, 397 U.S. 358 (1970), in support of his argument. To the
extent that appellant may be claiming that the State failed to prove beyond a reasonable doubt
that "the defendant did then and there commit said capital murder as a member of a criminal
street gang," as alleged in Count Two of the indictment, his claim is moot. As discussed above,
we have reversed and vacated the judgment in Count Two. Point of error eleven is overruled.

PROSECUTORIAL MISCONDUCT


 In point of error nine, appellant claims that the State failed to disclose the police
videotape of his arrest "until the suppression hearing, which was held on the first day of trial." 
Brady v. Maryland, 373 U.S. 83 (1963). In point of error ten, he alleges that the State
engaged in spoliation of the evidence by recording over part of the videotape. 

 Defense counsel first addressed the possible existence of the videotape during the
arraignment proceedings on October 12, 2004:

 [DEFENSE COUNSEL]: The other question was, when our client was
arrested out in the Hargill area, there was somebody there with a camera that was
there with the police. We are not sure if it was a police officer or not, but if it
was and there is a video of that, we would like a copy of that.


 * * *


 [PROSECUTOR]: We have no reason to believe that one exists, Your
Honor. This is the first that we have ever heard of any such thing, but we'll
inquire of the arresting officers to see if they saw anybody else in the area
filming.


 THE COURT: Okay. Just make sure that you check into that.


When defense counsel again asked for the arrest videotape during the pretrial proceedings on
October 18, the prosecutor responded that the police had informed him that there was none. 
 

 The hearing on appellant's motion to suppress was held on October 22 and 23. 
Detective Daniel Ochoa testified that he was present when appellant was arrested at his aunt's
trailer house in Hargill at around 2:45 p.m. on January 29, 2003. He testified that Detective
Oziel Plata had a video camera, but that there was no videotape because Plata "couldn't obtain
anything from where he was at." He testified that police recovered a duffel bag containing a
gun and clothing, but did not find any drugs at the residence. He could not recall if police
retrieved appellant's wallet. Neighbor Marita Morales testified that she observed one of the
arresting officers with a video camera:

Yeah, one of them when they went in. When they got off the vehicle, I saw a guy
that had one right here on the side. And while they were walking toward the
trailer, I guess he turned it on and he went to follow the rest inside the house,
and then when he got to the stairs, one of them yelled, camera, camera, and he
went inside, started filming inside the house.


She stated that she saw the "red little light" on the camera but acknowledged it was possible
that it could have been a "stand-by light." When the police brought appellant outside, she
overheard them talking: "I heard - I think they said that they had - they had found a gun and,
like, a bag of drugs or something in the room. That's why they were filming, I guess." She
further stated that the officer with the video camera kept filming outside the trailer for ten to
fifteen minutes after police took appellant away. 

 Appellant testified at the hearing on the motion to suppress that he was asleep when the
police arrived to arrest him. He testified that, as police escorted him from the trailer, he
"noticed a gentleman that was pointing a video camera on [him]." He testified that he was still
drowsy when he arrived at the Edinburg Police Department because he "was Roched up," which
means "[b]eing under the influence of pills." He testified that he had taken fifteen pills called
"Roches" and that he kept the pill packages inside his wallet, which was located on top of the
night stand. (13) He testified that, when he was in his cell prior to making his statement, Officer
Ramiro Ruiz asked him why he was sleepy and he responded that he "was Roched up." At the
close of the hearing, the trial court reminded the State to continue to look for any videotapes
that may exist.

 On November 5, during the individual voir dire proceedings, the following exchange
occurred:

 [PROSECUTOR]: Judge, I requested that on behalf of the State, pursuant
to discovery orders that you had entered, we have been able to obtain a copy of
a videotape that shows some of the arrest on Hargill, Texas.


 I'm going to hand to the defense a copy of that.


 * * *


 THE COURT: Is there anything that they would not have gotten from the
reports and from, you know, the testimony that they have already received that
may be contained in that videotape?


 [PROSECUTOR]: I believe a wallet is shown in the photographs and the
wallet is shown in the videotape. And in reviewing the testimony of the officer,
he testified about the wallet, that he said he could not remember if he did or did
not get it out of the bag.


 And I believe on the videotape it shows him taking the wallet, I think, if
I'm remembering right, out of the bag. That's the same officer.


 * * *


 [PROSECUTOR]: We took it upon ourselves to make the copy. Because
of the Court's order, we didn't wait for them to get us a copy of the tape. We
got a copy for them.


 THE COURT: Let me say this: You have handed in open court a copy of
the videotape. The only thing I will ask you to do is this: I will ask you to allow
them to see the original just to - just to appease them to make sure that there is
nothing in the original that is not on the copy.


 But take a look at it over the weekend, I guess.


 [DEFENSE COUNSEL]: I will.


 THE COURT: Let me know if there is anything else to take up.


 [PROSECUTOR]: And so that we can be clear, the videotape also
contains audio. They can turn up the volume an[d] listen to what is being said and
all that, and then they can compare that to their pretrial hearings and to the
testimony and they will be able to distinguish. But there is nothing on the audio
that says, hey, we found drugs or anything like that that is picked up by the
recorder.


 * * *


 THE COURT: By the way, if there is anything in the videotape that the
State or the defense wishes the Court to consider for purposes of any
reconsideration of the motion to - or additional evidence in support or against
the Motion to Suppress, I will be glad to reopen evidence now that that videotape
has been obtained.


 So if either side wants to reopen evidence on the Motion to Suppress,
you are free to do so. Just request it from the Court.


 [DEFENSE COUNSEL]: At this time, what we would like to do is review
the videotape over the weekend and see what shows up and make a decision at
a later date.


 * * *


 [DEFENSE COUNSEL]: I think that this Monday they informed us that
they found the wallet. The wallet was in the desk drawer or locker of one of the
police officers. It wasn't with the rest of the evidence that we reviewed
previously. And we have asked them to take us over there, and at a later date
we'll go when we have time and look at the wallet.


 During final pretrial proceedings on November 22, defense counsel requested to see
"the original videotape of the Hargill arrest, because all we got was a copy, and I know that
there was, like, three minutes missing in there and some of it at the end." The trial court
ordered the State to "give them the opportunity to check that tape to make sure that it is a true
and correct copy." 

 The guilt/innocence phase proceedings began on November 29. Defense counsel
neither requested that the trial court reopen evidence on the motion to suppress nor introduced
the videotape into evidence at trial. The issue did not arise again until defense counsel filed
a motion for a new trial alleging that the State engaged in suppression and spoliation of the
arrest videotape. 

 To establish a Brady violation, appellant must show that the prosecutor (1) failed to
disclose evidence (2) favorable to the accused and (3) that the evidence is material. Harm v.
State, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). Evidence is material if there is a
reasonable probability that, had the evidence been disclosed to the defense, the result of the
proceeding would have been different. United States v. Bagley, 473 U.S. 667, 682 (1985); Ex
parte Kimes, 872 S.W.2d 700, 702-03 (Tex. Crim. App. 1993). Appellant claims that the
videotape would have "corroborated the defendant's position that his statement was involuntary
because he was impaired from having ingested roach pills." 

 Defense counsel testified at the hearing on the motion for a new trial that, if the State
had disclosed the videotape prior to the hearing on the motion to suppress, then she would have
questioned the arresting officers about whether they found drugs in the trailer and would have
called an expert to testify about "the effects of this type of drug on this individual, the
voluntariness of the statement, that sort of thing." However, she admitted that she knew about
the "Roche" pills before appellant testified at the suppression hearing. She testified that "the
point to the tape" was that appellant looked "dazed" when he was arrested. She acknowledged
that she failed to introduce the tape into evidence at trial but claimed that she did not have time
to decide if that was the best course of action. The trial court pointed out that she received the
tape "long before the evidence portion [of trial] started" and that she had co-counsel to assist
her in making that decision. Further, Ramiro Ruiz denied talking with appellant in his jail cell
prior to the taking of his statement, and Edgardo Ruiz testified that he did not detect any signs
that appellant was intoxicated during the taking of his statement. Appellant has failed to show
that there is a reasonable probability that the result of the proceeding would have been different
if the State had disclosed the videotape earlier. 

 Appellant's claim that the State engaged in spoliation of the videotape is merely
speculative. At the hearing on the motion for a new trial, defense counsel argued that Morales
had testified at the suppression hearing that the officer continued videotaping after the arrest,
and that the police stated they found drugs but "none of that is on the videotape." Defense
counsel theorized that "[m]aybe they are part of the tape that got recorded over." The trial
court responded that Morales "testified that she didn't follow them around for every aspect of
the recording" and "was not specific [that] they had the recorder on at all times." On direct
appeal, appellant argues that the State "record[ed] over part of the tape showing the roach pills
on the floor." Appellant never testified at the suppression hearing that the pills were on the
floor. He testified that he kept the pill packages inside his wallet. On this record, we cannot
say that the State engaged in spoliation. Points of error nine and ten are overruled.

ADMISSION OF STATEMENTS


 In point of error fifteen, appellant claims that the trial court erred in admitting the
audiotaped statement he made to Officers Edgardo Ruiz and Ramiro Ruiz. In support of his
claim, he alleges that the testimony at the suppression hearing indicated that "the policemen
talked to [appellant] about his statement before they turned on the audiotape" and that "the
defendant was under the influence of roach pills at the time he gave his statement."

 The determination of whether a confession is voluntary is based on an examination of
the totality of circumstances surrounding its acquisition. Wyatt v. State, 23 S.W.3d 18, 23
(Tex. Crim. App. 2000) (citing Penry v. State, 903 S.W.2d 715, 744 (Tex. Crim. App. 1995)). 
At a suppression hearing, the trial court is the sole judge of the credibility of witnesses and the
weight of their testimony. Id. Therefore, we will not disturb the trial court's findings if those
findings are supported by the record. Id. We will only consider whether the trial court
properly applied the law to the facts. Id.

 Appellant testified at the suppression hearing that he had taken "Roche" pills on the
morning of January 29 and that he was asleep when the police came to arrest him that
afternoon. When he arrived at the Edinburg Police Department, he was placed in a holding cell,
where he went back to sleep. He testified that Officer Ramiro Ruiz came into his holding cell
and "kept making, like, comments, like saying I knew what I was there for." Ramiro said, "You
know that you are here for those shootings that happened in Monte Cristo. Why are you acting
stupid?" Appellant kept falling asleep, and "[e]very time [Ramiro] came by, he kind of made
noises to wake me up." He testified that Ramiro asked him why he was so sleepy, and he
responded that he "was Roched up." He was taken out of his cell to the "booking area" to be
photographed and fingerprinted. When he was placed back into the holding cell, Ramiro told
him he was going to take him out for questioning regarding "what had happened at Monte Cristo
Road." They went back to the booking area, and at that point appellant "asked them for a
lawyer." Appellant testified that he told Ramiro he wanted to call attorney Charles Banker,
who had represented him in the past, and that he wanted to look up his number. Ramiro said
they did not have a phone book, so appellant called a friend and asked him to have appellant's
mother call Charles Banker. After he made his phone call, he was taken to Officer Edgardo
Ruiz's office for questioning.

 Appellant testified that Edgardo and Ramiro told him "they knew everything that had
happened" and that Robert Gene Garza a/k/a "Bones" had made a statement against him. He
testified that they played part of Garza's audiotaped statement and said, "Everybody is crying. 
Why don't you just go ahead and save yourself. You are the only stupid one getting sent to
death row because everybody is pointing the finger to you." Appellant told them to put him
back into his cell because he did not want to talk to them. He "denied it for a while longer,"
then "admitted that [he] was there." He agreed to waive his rights and gave an audiotaped
statement because he "wanted to go back to sleep," and he thought they were not going to let
him go until he talked to them. He testified that he "couldn't make decisions correctly"
because he was "intoxicated."

 Edgardo Ruiz testified that he first met appellant when he was brought to his office at
the Edinburg Police Department on the afternoon of January 29. Edgardo testified that he read
appellant his rights "about a minute" after he met with him. Appellant indicated that he
understood his rights, signed a written waiver of his rights, and agreed to talk to him. Edgardo
gave appellant some "general information" that they already had some suspects and that they
had reason to believe that appellant was also involved, but he did not tell him that Garza had
implicated him. Appellant then began telling Edgardo his version of events. Edgardo was about
to take a written statement from him when Ramiro "came by to check how was everything
going." Ramiro suggested that they audiotape appellant's statement, and appellant agreed. 
When Ramiro left to get a cassette recorder, Edgardo and appellant "kind of paused for a while
. . . waiting." Edgardo testified that appellant was "very cooperative," did not appear to be
intoxicated, and never complained that he was tired, sleepy, hungry, or thirsty. 

 Ramiro testified that his first contact with appellant was in Edgardo's office. He
testified that he did not see appellant in his jail cell or at booking. Edgardo told Ramiro that
he was taking appellant's statement, and Ramiro suggested that they audiotape it. He left
Edgardo's office to get a cassette recorder and returned about five minutes later. He and
Edgardo then proceeded to take appellant's audiotaped statement.

 The trial court made findings of fact that included the following: 


 Edgardo read appellant his rights before he was interviewed; 


 

 (2) appellant indicated that he understood his rights and agreed to waive his rights
and speak with Edgardo; 


 (3) appellant gave his account of the crime only after being advised of his rights and
waiving his rights; 


 (4) Edgardo did not observe any signs that appellant was intoxicated; 


 (5) appellant did not complain of being tired or sleepy; and 


 (6) Ramiro did not speak with appellant in the booking area or jail cell prior to
taking his statement in Edgardo's office. 


The trial court found that the testimony of Edgardo and Ramiro was credible and that the
testimony of appellant was not credible. The trial court ultimately concluded that "the
statement, in question, was recorded as a result of the knowing, intelligent, and voluntary
waiver by [appellant] of his rights and is a free and voluntary statement made by [appellant]."

 The trial court's findings and conclusions are supported by the record. (14) Point of error
fifteen is overruled. 

 In point of error thirteen, appellant argues that the trial court erroneously admitted at
the guilt phase his "unwarned" responses to Officer Robert Mendiola's questions regarding his
gang affiliation. He alleges violations of Miranda v. Arizona, 384 U.S. 436 (1966), and
Article 38.22. (15) 

 Appellant was arrested on the afternoon of January 29. Robert Mendiola testified that
he was the "processing officer" who booked appellant into the Hidalgo County Jail on the
following day, January 30: Q. And as a processing officer, are there questions that you ask all
prisoners, all people coming in, routinely for booking procedures?


A. Yes, sir. Medical, their gang affiliation, and their addresses.


Q. What is the purpose of asking the individual himself what his medical
condition is?


A. To see if he has to go to the infirmary, if he has to be sent out to the
hospital for any reason.


Q. And is there a list of medical conditions that you question them about?


A. Yes, sir. Diabetes, blood pressure, epilepsy, hepatitis.


Q. And are those also things that keep the jail safe?


A. Yes, sir.


 * * *


Q. What purpose does it serve to ask people that are going to be in the
county jail what their gang affiliation is?


A. So that we won't put them with a rival gang if they are gang-related.



 * * *


Q. If you know, why don't you put people from different gangs in the same
area?


A. Because a fight would happen, sir. Somebody would get hurt.


Q. So this is a routinely-asked question?


A. Yes, sir.


 * * *


Q. Can you give the jury and the record other examples of questions that
you ask - - not the answers, but questions that you ask to people that are
going to be put in the county jail?


A. If they have ever tried to commit suicide. Let's see, any recent loss in
the family. The medical history and also hepatitis, epilepsy.


Q. HIV?


A. Yes, sir.


Q. And these are questions that are designed to protect the jail - - 


A. Yes, sir.


Q. - - the people working in the jail?


A. Yes.


 * * *


Q. You asked this defendant if he was - - if he had any gang affiliation. Is
that correct?


A. Yes, sir.


 * * *


Q. And what gang is it that he told you he was affiliated with?


A. The Bombita gang. 

 

 Miranda and Article 38.22 apply only to custodial interrogation. Dowthitt v. State,
931 S.W.2d 244, 263 (Tex. Crim. App. 1996). A custodial interrogation occurs when a
defendant is in custody and is exposed to any words or actions on the part of the police that the
police should know are reasonably likely to elicit an incriminating response. Roquemore v.
State, 60 S.W.3d 862, 868 (Tex. Crim. App. 2001); Rhode Island v. Innis, 446 U.S. 291,
300-01 (1980). Questions normally attendant to administrative "booking" procedure do not
constitute "interrogation" because they do not normally elicit incriminating responses. Cross
v. State, 144 S.W.3d 521, 524 n. 5 (Tex. Crim. App. 2004); Pennsylvania v. Muniz, 496 U.S.
582, 601 (1990)(questions about defendant's name, address, height, weight, eye color, date
of birth, and current age were not designed to elicit incriminatory admissions); South Dakota
v. Neville, 459 U.S. 553, 564 n. 15 (1983)(in the context of a DWI arrest, a police inquiry of
whether the suspect would take a blood-alcohol test was not "interrogation" within the meaning
of Miranda).

 Mendiola testified that during booking procedures all prisoners are routinely asked
about "[m]edical [history], their gang affiliation, and their addresses." He explained that he
routinely asks prisoners about their gang affiliation "[s]o that we won't put them with a rival
gang if they are gang-related" because "a fight would happen" and "[s]omebody would get hurt." 
The gang-affiliation question in this case was one normally attendant to the administrative
booking procedure and was necessary to secure the safety of inmates and employees at the
county jail. It was a routine booking question as opposed to a custodial interrogation; thus,
Mendiola was not required to give appellant the warnings of Miranda and Article 38.22. We
also point out that appellant had already acknowledged his gang affiliation in his Mirandized
audiotaped statement to Ramiro and Edgardo Ruiz the previous day. Point of error thirteen is
overruled.

 In point of error sixteen, appellant complains that he cannot "properly and fully brief"
the issue of whether the trial court erred in admitting his gang-affiliation statements to
Mendiola "because the trial court has yet to make findings of fact and conclusions of law" on
the voluntariness of these statements. Art. 38.22, § 6. As discussed above, appellant answered
a routine booking question; he was not subjected to custodial interrogation. Article 38.22 does
not apply. Thus, the trial court was not required to make findings and conclusions on the
voluntariness of appellant's statements to Mendiola. Point of error sixteen is overruled.

 In points of error seventeen-a and twenty-five, appellant alleges that the trial court
erroneously permitted Investigator Robert Alvarez to testify that appellant's parole officer had
told him that appellant "had proclaimed to be a Tri-City Bomber." Appellant contends that this
statement is hearsay and that the admission of this statement violated his right to due process
under the Fifth Amendment to the United States Constitution and Article I, Sections 13 and 19,
of the Texas Constitution. Appellant, however, failed to object to this testimony at trial. TEX.
R. APP. P. 33.1. Points of error seventeen-a and twenty-five are overruled.

 In point of error seventeen-b, appellant asserts that the trial court erroneously permitted
Sergeant Alex Champion to testify at punishment that appellant admitted that marijuana found
in his jail cell belonged to him. Appellant claims that his statement was admitted in violation
of Miranda and Article 38.22. Appellant failed to object to the admission of this testimony;
thus, he forfeits his right to complain on appeal. TEX. R. APP. P. 33.1. Point of error
seventeen-b is overruled.

 In point of error eighteen, appellant claims that the trial court is depriving him of a
complete record on appeal by not having filed requested findings of fact and conclusions of
law on each of his statements. In point of error nineteen, appellant claims that this Court is
depriving him of due process of law "by requiring him to proceed on appeal on an incomplete
appellate record."

 On June 28, 2006, this Court ordered the trial court to file findings of fact and
conclusions of law as required by Article 38.22, Section 6. On July 13, 2006, the trial court
complied with this order and signed and entered findings of fact and conclusions of law on the
voluntariness of appellant's audiotaped statement. The trial court was not required to make
findings and conclusions on the rest of appellant's challenged statements. As discussed above,
Article 38.22 does not apply with regard to appellant's gang affiliation statements to Mendiola,
and he failed to preserve error with regard to the other challenged statements. (16) Points of error
eighteen and nineteen are overruled.

VOLUNTARINESS INSTRUCTION

 In point of error six, appellant claims that the trial court erroneously refused his
specific requested Article 38.23 instruction pertaining to the voluntariness of his statement,
which read:

 No evidence obtained by an officer or other person in violation of any
provisions of the Constitution or laws of the State of Texas, or of the
Constitution or laws of the United States of America, shall be admitted in
evidence against the accused on the trial of any criminal case.


 If you believe, or have a reasonable doubt, that evidence was obtained
illegally, then and in such event, you shall disregard any such evidence so
obtained.


 In Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694
(1966), the U.S. Supreme Court determined that prior to any questioning, the
person must be warned that he has the right to remain silent, that any statement
he does make may be used as evidence against him, and that he has a right to the
presence of an attorney, either retained or appointed. Unless a suspect
knowingly, voluntarily and intelligently waives these rights, any incriminating
responses to questioning may not be introduced into evidence in the
prosecution's case in chief in a subsequent criminal proceeding.


 Now if you believe, or have a reasonable doubt, that Juan Ramirez, while
under arrest, was first questioned by the police without having been informed of
and having knowingly, voluntarily and intelligently waived his rights under
Miranda, then and in such event, you shall disregard the recorded statement and
any such evidence obtained therefrom.


The trial court instead instructed the jury in the following manner:

 You are instructed that if you believe from the evidence, or if you have
a reasonable doubt thereof, that the alleged confession or statement of the
Defendant was not voluntarily made, you will not consider the same for any
purpose.


 You are instructed that unless you believe beyond a reasonable doubt that
the alleged confession or statement introduced into evidence was voluntarily
made by the Defendant, or if you have a reasonable doubt thereof, you shall not
consider such alleged statement or confession for any purpose.


 Appellant contends that the trial court's instruction was too "abstract" and failed to
apply the law to the facts. 

 At the jury charge conference, appellant claimed that there was some testimony that
supported the notion that there was a time gap between the decision to take the videotaped
statement, which included all appropriate Miranda warnings and waivers, and its actual
commencement. On appeal, he argues that his "requested charge applied the law to the facts,
telling the jury to disregard the statement if they thought that the policemen 'worked on'
[appellant] before they turned the machine on." (17) Because appellant relies exclusively upon
our decision in Perry v. State, 158 S.W.3d 438, 443-46 (Tex. Crim. App. 2004), we assume
that he is alleging a due-process voluntariness claim-not a Miranda claim-based upon his
evidence of drug use and general tiredness at the time he gave his recorded statement and the
fact that there was a potential window of opportunity for the police to "work on" him before
he gave that statement. In this regard, we have consistently held that when the issue of
voluntariness is raised, a defendant is entitled only to a general instruction on the fact of
voluntariness. Dinkins v. State, 894 S.W.2d 330, 353-354 (Tex. Crim. App. 1995); Burdine
v. State, 719 S.W.2d 309, 319-320 (Tex. Crim. App. 1986). The trial court did not abuse its
discretion in refusing appellant's specific requested instruction. Point of error six is
overruled.

ADMISSION OF PHOTOGRAPHS

 In points of error twenty-two and twenty-four, appellant complains that the trial court
erroneously admitted State's Exhibits 26 through 95, in violation of Rule 403 of the Texas
Rules of Evidence. He asserts, "The trial court's conclusion that the photographs were more
probative than prejudicial was not supported by the evidence." He further argues that the
photographs "did not go to resolve any disputed issue and were calculated 'solely to inflame
the minds of the jury.'"

 Although appellant complains about State's Exhibits 26 through 95, he objected only
to the admission of State's Exhibits 69, 70, 71, 74 through 80, 85 through 89, and 93 through
95. He failed to object to the other photographs at issue. Thus, he has waived his complaints
pertaining to State's Exhibits 26 through 68, 72, 73, 81 through 84, and 90 through 92. TEX.
R. APP. P. 33.1. 

 Rule 403 requires that a photograph have some probative value and that its probative
value not be substantially outweighed by its inflammatory nature. Tex. R. Evid. 403; Long v.
State, 823 S.W.2d 259, 272 (Tex. Crim. App. 1991). A court may consider many factors in
determining whether the probative value of photographs is substantially outweighed by the
danger of unfair prejudice. These factors include: the number of exhibits offered, their
gruesomeness, their detail, their size, whether they are in color or black-and-white, whether
they are close-up, whether the body depicted is clothed or naked, the availability of other
means of proof, and other circumstances unique to the individual case. Long, 823 S.W.2d at
272; Santellan v. State, 939 S.W.2d 155, 172 (Tex. Crim. App. 1997). The admissibility of
photographs over an objection is within the sound discretion of the trial judge. Sonnier v.
State, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995). 

 The photographs depict the victims as they were found at the crime scene. (18) They are
in color and are approximately 8 ½" by 11" in size. State's Exhibits 69, 70, and 71 show the
body of Delgado, III, lying face-down in the grass from various angles. His head injury is not
visible in State's Exhibit 69, but it is visible in State's Exhibits 70 and 71. State's Exhibits 88
and 89 show Delgado, III, after he was turned over on his back. His head injury is visible in
both photographs, but State's Exhibit 88 depicts his face and head at a closer angle.

 State's Exhibits 74, 75, 76, and 77 show the bodies of Almendarez and Delgado, Jr.,
lying face-down in the east-side house. State's Exhibits 78, 79, and 80 offer closer views of
their head injuries. State's Exhibits 93, 94, and 95 show their injuries from another angle, after
they had been turned over onto their backs.

 State's Exhibits 85 and 86 show the body of Castillo as it was found in the bedroom of
the east-side house. He is lying face-down, and the gunshot wound to his buttocks is visible. 
State's Exhibit 87 shows the body of Jerry Hidalgo as he was being turned over onto his back. 
He is shirtless and his injuries are visible in the photograph. 

 The trial court admitted the photographs, ruling that they were "not duplicative" and that
their probative value was not outweighed by any prejudicial effect. The trial court did not abuse
its discretion in admitting the photographs. Although the photographs depict the victims'
bloody gunshot wounds, they portray no more than the gruesomeness of the injuries inflicted. 
Narvaiz v. State, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992). The danger of unfair
prejudice did not substantially outweigh the probative value of the photographs. The
photographs were relevant and probative to the jury's understanding of the crime scene and the
victims' injuries. Points of error twenty-two and twenty-four are overruled.

FUTURE DANGEROUSNESS SPECIAL ISSUE

 In points of error twenty and twenty-one, appellant challenges the constitutionality of
the future dangerousness special issue. He argues that the "unreliability of long term
predictions of future-dangerousness" violates the federal and state constitutional guarantees
of due process and due course of law. The United States Supreme Court has held that "the
likelihood of a defendant's committing further crimes is a constitutionally acceptable criterion
for imposing the death penalty." Barefoot v. Estelle, 463 U.S. 880, 896 (1983). We have also
rejected this argument in previous cases. McBride v. State, 862 S.W.2d 600, 611 (Tex. Crim.
App. 1993); Joiner v. State, 825 S.W.2d 701, 709 (Tex. Crim. App. 1992). Points of error
twenty and twenty-one are overruled.

INADEQUATELY BRIEFED POINTS OF ERROR


 Appellant includes several points of error in the "Table of Contents" section of his
brief, but fails to discuss them and/or support them with legal citation in the body of his brief. 
These points are stated in their entirety as follows:

8. The Texas Death penalty statute is unconstitutional as applied to this
defendant, who was 18 at the time of the offense, considering evolving
standards of decency.[ (19)] It is true that this issue was reviewed some
fifteen years ago and a determination contrary to defendant's position
had. Stanford v. Kentucky, 492 U.S. 361 (1989).


12. The trial court erred in excluding evidence at the punishment phase: the
interview with the expert.

 

14. The defendant was deprived of counsel at a critical stage of the
proceedings, the twenty-nine days following the pronouncement of
sentence from December 18, 2004 until January 17, 2005.[ (20)] The
defendant's right to counsel preempts the state procedural rule on time
limits for filing a Motion for New Trial. U. S. CONST. amend. VI; TEX.
CONST. Art. I, sec. 10.


26. The trial court erred in overruling Appellant's Motion for Mistrial
responding to evidence of the stabbing of a death row guard by Jorge
Salinas. [record citation omitted]. Appellant did not open the door to
such argument. The prosecutor pried the door open. Any instruction
could not have cured such an error. 


27. The trial court erred in admitting the defendant's statement without an
official translation of the non-English portion of the statement,
containing both words of the defendant and words of the officer taking
the statement. 


Without more, these points of error are inadequately briefed. TEX. R. APP. P. 38.1. Points
of error eight, twelve, fourteen, twenty-six, and twenty-seven are overruled. (21)

 We affirm the trial court's judgment and sentence of death for Count One, and we
reverse appellant's capital-murder conviction in Count Two on the grounds of double jeopardy
and vacate the judgement on that count.

Delivered: December 12, 2007


Do Not Publish 
1. Appellant was also indicted under Cause Number CR-0956-03-B for murdering more than
one person during the same criminal transaction. Tex. Penal Code § 19.03(a)(7). That cause was
dismissed.
2. Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal
Procedure.
3. The "west-side house" had a kitchen, living room, two bedrooms, and a utility room. There
was a storage shed behind it. An outhouse was located behind the "east-side house."
4. This is the type of bullets used in an AK-47.
5. Delgado, Jr., and Delgado, III, were step-brothers. Villa testified at trial that Delgado, Jr.,
was his cousin.
6. When booked, appellant said he was connected to the "Bombita" gang. This gang was
formerly part of the "Tri-City Bombers" or "the TCBs." See infra p. 9.
7. Officer Ramiro Ruiz testified that the literal Spanish to English translation of "cuerno de chivo"
is "the horn of a goat or a ram, how it curves," but that he has heard the term used to describe "the
AK-47 or 7.62 by 39 caliber rifle."
8. This was the "west-side house" in which the body of Jerry Hidalgo was found.
9. DNA testing revealed that Robert Garza a/k/a/ "Bones" could not be excluded as a
contributor of DNA on a black cap found at the scene.
10. We note the distinction between this case and the recent case of Garza v. State, 213
S.W.3d 338 (Tex. Crim. App. 2007), in which the defendant was given one death sentence under
Section 19.03 and one unauthorized death sentence under Section 71.02.
11. "A person is criminally responsible for an offense committed by the conduct of another if
acting with the intent to promote or assist the commission of the offense, he solicits, encourages, directs,
aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE § 7.02(a)(2).
12. It appears that appellant may be raising an additional sufficiency challenge with regard to
mitigation; however, we do not review the sufficiency of the evidence to support a jury's negative
answer to the mitigation special issue. Russeau v. State, 171 S.W.3d 871, 886 (Tex. Crim. App.
2005), cert. denied, 126 S. Ct. 2982 (2006). Appellant also argues that psychiatric testimony on
future-dangerousness is so unreliable "as to violate the guaranty of due process." We note that the
State did not present expert psychiatric testimony on future-dangerousness in this case.
13. Appellant also referred to the pills as "premilin pills." The evidence further showed that the
terms "Roche" or "roach" are slang for the drug Rohypnol.
14. Appellant also generally mentions that Ramiro "had a pattern of disregarding detained
people's requests for a lawyer." Although he fails to develop this argument on appeal, he is apparently
referring to defense counsel's attempt at the suppression hearing to show that Ramiro had violated
Robert Gene Garza's rights when taking his statement. The trial court found, and we agree, that this is
not relevant to the voluntariness of appellant's audiotaped statement in the instant case. 
15. Again, we note that we have reversed and vacated the judgment in Count Two, which
contained the additional allegation that appellant committed the offense "as a member of a criminal
street gang." Thus, we address any claims regarding the admission of gang evidence only in the context
of Count One.
16. This does not mean that the trial court would have been required to make findings and
conclusions regarding the other challenged statements.
17. Appellant's Brief at 37.
18. In his brief, appellant mistakenly refers to the exhibits as autopsy photographs.
19. In Roper v. Simmons, 543 U.S. 551, 568 (2005), the United States Supreme Court
declared that the execution of juvenile offenders under the age of 18 violates the Eighth Amendment.
20. To the contrary, the record reflects that appellate counsel was appointed on December 22,
2004. 
21. We also note that point of error twenty-three is omitted from appellant's brief.